UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,                    CIVIL ACTION No.

      v.                          HON.

GARY J. BURTKA,

          Defendant.

_____/

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges and states as follows:

## SUMMARY

1.      The Securities and Exchange Commission brings this civil action in connection with violations of the antifraud provisions of the federal securities laws by the City of Allen Park, Michigan ("the City" or "Allen Park") and the Allen Park City Administrator from approximately 2008 through at least May 2011.

2.      During that period Defendant Gary J. Burtka ("Burtka") was the Mayor of Allen Park and a member of the Allen Park City Council, which governed the City.  Defendant also appointed the City Administrator, who oversaw the daily operations of the City.  The City Administrator reported on a daily basis to Defendant.

3.      Defendant accordingly participated in the operations of, and possessed the practical ability to direct the actions of, both the City and the City Administrator while he was the Mayor of Allen Park.  He therefore was a "control person" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78t(a)].

4.      Because Defendant Burtka controlled the City and the City Administrator during the period that each one violated the federal securities laws, he is liable for their violations to the same extent each one of them is liable.

5.      In 2008 the City began planning an economic development project in the form of a $146 million movie studio ("Studio Project") with eight sound stages, led by a Hollywood executive director.

6.      Defendant championed the Studio Project idea and made numerous public pronouncements promoting it.  Defendant advocated for the Studio Project and reported that it was proceeding well in numerous meetings with other municipal officials and City residents.  He did not inform residents and other City Council members about difficulties the Studio Project was encountering.  Many public statements Defendant Burtka made about the status of the Studio Project were not accurate.

7.      During the period that Defendant was making these public statements regarding the Studio Project, the City voted to issue municipal bonds to ensure that the Studio Project took place.  In November 2009 the City issued a total of $28.275 million in municipal general obligation limited tax bonds ("2009 Bonds").  It issued another $2.725 million of such bonds in June 2010 ("2010 Bonds") (collectively "Bonds").

8.      The offering documents for the Bonds stated that the Bonds were to be repaid, at least initially, from revenues the City expected to generate from leasing space to numerous media-related entities.  The offering documents also described the Studio Project as a $146 million facility consisting of 750,000 square feet of space including eight sound stages, which would employ thousands of union and skilled workers, and be led by an experienced Hollywood production executive.

9.      By the time the City issued the Bonds, however, the plans to implement and pay for the Studio Project had deteriorated significantly.  None of these changes, however, were reflected in the Bond offering documents nor in any of the City's other public statements.

10.     The Bond offering documents also included outdated City budget information which did not disclose that the City faced a budget deficit for Fiscal 2010 of at least $2 million, or over 8.4% of its total general revenue fund.

11.     At the time the City offered and sold the Bonds, Defendant and other City officials knew of the deterioration in the scope and viability of the Studio Project.

12.     Through the activities alleged in this Complaint, as a control person of the City and the City Administrator, Defendant Burtka is liable for violations by the City and the City Administrator of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5] promulgated thereunder.

## DEFENDANT

13.     Defendant Gary J. Burtka, age 65, resides in the City of Allen Park, Michigan. He was a member of the City Council from 1995 to November 2007, when he was elected to be

the Mayor of Allen Park.  Defendant was the Mayor of Allen Park from November 2007 until he

resigned in May 2011.

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to Section 27 of the

Exchange Act [15 U.S.C. § 78aa].  Venue is proper in this Court pursuant to Section 27 of the

Exchange Act [15 U.S.C. § 78aa].

15.     The acts, transactions, practices, and courses of business constituting the

violations alleged herein have occurred within the jurisdiction of the United States District Court

fot the Eastern District of Michigan and elsewhere.

16.     Defendant, directly and indirectly, made use of the means and instrumentalities of

interstate commerce, the means and instruments of transportation and communication in

interstate commerce, and the mails, in connection with the acts, transactions, practices and

courses of business alleged herein.

## FACTS

### Background

17.     The City of Allen Park is located 13 miles from the City of Detroit, Michigan.  It

previously has been governed by a City Council consisting of six elected members and the

Mayor.  The City is currently in receivership and governed by an Emergency Manager whose

appointment expired at the end of September 2014.   After the Emergency Manager departed, a

Receivership Transition Advisory Board (RTAB) consisting of members appointed via a final

Order of the Emergency Manager was installed to oversee the transition of the City to home rule.

The City ultimately will return to being governed by a seven-member City Council consisting of the Mayor and six elected members.

18.     Allen Park operates pursuant to a City Charter which sets out the responsibilities of various City officials.  According to the City Charter, the Mayor appoints a City Administrator, subject to the approval of the City Council.  The City Administrator is responsible for running the City's daily operations.  When Defendant was elected as the City's Mayor, he immediately appointed a City Administrator.

19.     The City Administrator's responsibilities included preparing and submitting an annual budget to the City Council, and carrying out the directives of the City Council.  The City Administrator also was required to report to the City Council on "any and all matters" that "may require the Council's attention and action" and to perform "such other duties as may be prescribed…by ordinance or by direction of the Council."

20.     In April 2008 the State of Michigan enacted legislation that provided significant tax credits to film studios conducting business in Michigan.  In August 2008 the City was approached by an owner and operator of a California film and post-production sound studio ("Producer") who inquired about building the Studio Project in the City.

21.     The City Council believed that the Studio Project would bring much-needed economic development to the City.  To support the Project, the City Council therefore agreed to offer what ultimately became a total of $28.275 million of general obligation limited tax bonds issued on November 12, 2009 ("2009 Bonds") and another $2.725 million of general obligation limited tax bonds issued on June 16, 2010 ("2010 Bonds").

### Movie Studio Project

23.     The City and the Producer planned that the Studio Project would be financed and built through a Public Private Partnership ("PPP"), consisting of a limited liability corporation with the City, the Producer and a private developer ("Developer") as members.  The City would use the municipal bond proceeds to buy land which it then would donate to the PPP to use for the Studio Project.  The Developer would finance and build necessary structures on the land while the Producer would manage the Project and find investors to fund the film production.

24.     In April 2009, the City issued a press release about the Studio Project.  The release quoted Defendant Burtka as saying the Studio Project amounted to an "economic development blockbuster" representing "job opportunities for thousands . . . who have lost their jobs" and that the City "did not need to raise taxes a penny to win this project . . . ."

25.     Defendant Burtka also participated in drafting other documents that were publicly distributed with the April 2009 press release and maintained on the City's website through at least June 2010. Those documents described the Studio Project as a full-service film and media production facility that would employ thousands of unionized, skilled workers, be located on 104 acres, consist of 750,000 square feet of facilities including eight sound stages, and be led by a Hollywood production executive, at a cost of $146 million.

26.     In May 2009, as the City Administrator was preparing the City's Fiscal 2010 budget, the City faced a deficit of approximately $2 million.  The Producer offered to provide up to $2 million to remove the deficit.  Although the City Administrator originally understood the $2 million would be a "financial gift," the Producer sent the City Administrator a letter on May

14, 2009, stating that the $2 million was a "capital repayment" contingent on the City's contribution of land to the PPP.

27.     In early June 2009, the Producer, the City, and a Developer signed an agreement for the PPP, pursuant to which the Developer committed $20 million for the Project's first phase. Defendant Burtka signed the contract on behalf of the City.

**The Collapse of the PPP and the City's $2 Million Budget Shortfall**

27.     In July 2009 the City's bond counsel advised the City that bond proceeds could not be used to purchase land that then would be donated to the PPP.

28.     Because the City could not donate assets purchased with bond proceeds, it could not meet the contribution requirements necessary for membership in the PPP.  As a result, the plans for the PPP collapsed.  The collapse of the PPP meant that the Developer, who had pledged to contribute $20 million, no longer had any obligations to the Studio Project.

29.     The collapse of the PPP also meant that the City had a projected deficit for Fiscal 2010 of $2 million, because the Producer no longer was obligated to pay the City $2 million. The City Administrator knew this but took steps to create the false impression that the City would still receive the $2 million.  The $2 million purported "donation" represented 8.4% of the City's budgeted $22 million in Fiscal 2010 revenue and was instrumental in creating the false appearance that the City's budget for Fiscal 2010 had no deficit.

30.     In addition, the Producer's proposal to attract investors, media producers and tenants for the Studio Project had been based on the assumption that he would manage and control the entire Project.  When the PPP collapsed, however, the City decided to own and manage the property itself.  By August 2009, the plan was that the Producer was only going to

lease 100,000 square feet and to operate a vocational school to train potential workers in the movie production business.

## Wayne County and the City's Public Statements

32.     Wayne County originally planned to support the Studio Project by issuing up to $12 million of municipal bonds and granting favorable tax status to the Studio Property.  The County, however, raised numerous concerns about the viability of the Project from the start, expressing these concerns in writing and meetings with both Defendant Burtka and the City Administrator.

33.     By August 2009, the County informed the City that it would not grant favorable tax status to the property.

34.     The City nevertheless issued a press release on August 14, 2009 in which Defendant Burtka announced that ground breaking for construction was beginning at the Studio Project.  The press release also announced that all details of the Studio Project, including financing, were complete and that the "all-encompassing film, TV and media production facility will open in October."  None of these statements was true.

35.     In late September 2009, the County further advised the City that it would not issue the $12 million municipal bonds without additional information.  The City Administrator advised Defendant Burtka that without the County's municipal bonds, the City could incur up to $4 million of additional interest.  On October 6, 2009, the County confirmed that it would not provide any municipal bond financing for the Studio Project.

36.     In response to concerns raised by a resident during an October 13, 2009 public City Council meeting, Defendant Burtka stated falsely that the Producer's company would move

8

in shortly "creating four stages, four movie stages" and serve as an anchor for an entertainment district.  Throughout the October 13, 2009 public meeting, neither Defendant Burtka nor the City Administrator discussed any of the negative developments that were impairing the Studio Project, including the fact that there were no prospects for building sound stages.

### The 2009 Bonds Did Not Disclose Material Negative Information

37.    The City Administrator was the primary source of information used in drafting the offering documents for the 2009 Bonds.  He also received drafts of the offering documents, provided comments that were incorporated into the final versions, and certified on behalf of the City that, to its best knowledge and belief, the document was "true and correct" and did not "contain, nor omit, any material facts or info which would make the statements contained herein misleading."

38.    The City, however, did not disclose any of the adverse developments in the offering documents for the 2009 Bonds.  Similarly, the offering documents had no disclosure or discussions regarding any potential risks.

39.    In fact, the offering documents contained a number of material misstatements. First, the offering documents repeated substantially all of the information about the Studio Project that had been contained in the City's initial April 2009 press release announcing the Project, even though the plans for the Studio Project had deteriorated significantly after April 2009.

40.    In addition, the offering documents stated that the City intended initially to repay the Bonds by leasing facilities at the Studio Project and using the lease revenues towards payment of the Bonds.  This representation was highly relevant to the City's ability to service its

debt since the expected annual debt service otherwise would have constituted approximately 10% of the City's budget.  The offering documents also stated that the City had existing leases "under contract" totaling $1.6 million for 48% of the available space and that additional lease arrangements, representing 27% of the available space, were currently in negotiation.

41.     By the time the 2009 Bonds were issued, however, the projected $1.6 million of annual lease revenue included at least $300,000 from the Producer, which the City's Administrator knew to be uncertain.  The City Administrator also was aware that there were no existing negotiations regarding 27% of available space.

42.     Finally, the City attached its projected Fiscal Year 2010 budget as an appendix to both its 2009 and its 2010 offering documents.  The budget, which reflected the City's expectation that it would have a general fund surplus at the end of Fiscal Year 2010, appeared to be balanced because it was based on the assumption that the Producer would donate $2 million to the City.  The City Administrator, however, knew that the Producer no longer intended to pay $2 million to the City.  The budget attached to the 2009 offering documents thus was materially misleading.  The City really faced a projected $2 million deficit for Fiscal 2010.

### The Bonds were rated "A" and Issued in November 2009

43.     Standard & Poor ("S&P") reviewed information provided by the City and others in order to rate the City's 2009 Bonds.  The City Administrator did not inform S&P that the Producer no longer intended to pay $2 million to the City and thus misled S&P regarding the actual condition of the City's Fiscal Year 2010 budget.

44.     S&P assigned the City's 2009 Bonds an "A" rating, based on its misunderstanding that the City's FY 2010 budget was balance.  S&P's write-up noted, however,

10

that the FY 2010 budget was balanced only because of the $2 million donation, and it pointed out that the City would have to address this structural imbalance.

45.     The "A" rating by S&P was material to investors who purchased the 2009 Bonds.

**Additional Adverse Developments Occurred Before the City Issued its June 2010 Bonds**

46.     After the 2009 Bonds were issued, the City retained a company to manage the Studio Project site.  On February 12, 2010, the management company advised that the City would experience a significant decrease in net cash flow at the site at least for the first three years, rather than the increase from lease revenues it had expected.  This was due to hiring agents to solicit prospective tenants, management companies, providing rent forgiveness and building out properties.

47.     On May 6, 2010 the City served the Producer with an eviction notice.  The City and the Producer then negotiated an amended lease for only one-half the amount of space at one-half the rent, with rent payments postponed until August 2010. Defendant Burtka signed the amended lease on behalf of the City.

48.     Despite these additional significant negative developments affecting the Studio Project, the City issued the 2010 Bonds on June 16, 2010.  Although two weeks before the 2010 Bonds were issued, the City Council had adopted a budget for Fiscal Year 2011 which acknowledged the $2 million budget shortfall, the offering documents for the 2010 Bonds again incorporated the City's Fiscal 2010 budget figures which omitted the $2 million shortfall.

49.     The 2010 Bond offering documents misleadingly continued to list tenants at the Studio Property with purported "total leases under contract represent[ing] approximately $1.6

11

million of annual revenue."  The 2010 Bond offering documents stated that the total annual debt service was $2.6 million, an increase from the $2.2 million stated in the 2009 Bonds.

50.     Finally, notwithstanding that the Producer by this time had reduced his presence at the Studio Project by half, the offering documents falsely continued describing the Studio Project as a "$146 million, full-service movie, television and new media production studio" that would include 750,000 square feet, eight sound stages, employ thousands of unionized skilled workers and be managed by the Producer.

51.     The City Administrator again was the primary source of information for the 2010 Bond offering documents.  He also reviewed and approved them and certified, on behalf of the City, that, to the City's best knowledge and belief, the document was "true and correct" and did not "contain, nor omit, any material facts or info which would make the statements contained herein misleading."

52.     On September 29, 2010 the Producer advised the City that he was terminating his lease at the Studio Property.  He vacated the site on October 4, 2010.  The City Administrator resigned on February 27, 2011 and Defendant Burtka resigned on May 24, 2011.

## The Effect of the Studio Project Collapse on the City

53.     The collapse of the Studio Project had a significant impact on the City's financial condition.  The City filed a notice on the Electronic Municipal Market Access system ("EMMA") on December 29, 2010 that it was not filing an annual report for fiscal year 2010.

54.     On March 8, 2011 S&P downgraded the City's unlimited tax bonds to BB+ and its limited tax GO bonds to BB+.

55.     The City did not file any continuing disclosure until January 4, 2012, at which time it announced it had received a "going concern" opinion from its auditors.  On June 21, 2012 the Michigan State Treasurer began a Preliminary Review of the City, pursuant to State law, and issued a Final Report on August 8, 2012 recommending the appointment of an Emergency Manager.  The Studio Project was listed as a primary factor in the City's deteriorating economic condition.   An Emergency Manager was appointed in October 2012.

56.     The City's most recent annual audit report, dated December 16, 2013, for Fiscal 2013, again includes a "going concern" opinion because of the City's general fund deficit of $694,185 and its Studio Project fund deficit of $10,370,611.

## CLAIMS FOR RELIEF

### COUNT I
**Control Person Liability**
**Section 20(a) of the Exchange Act [15 U.S.C. Section 78t(a)]**

57.     Paragraphs 1 through 56 are re-alleged and incorporated by reference as if fully set forth herein.

58.     The City of Allen Park violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as described above, which is incorporated by reference as if set forth fully herein.

59.     The City Administrator of the City of Allen Park violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as described above, which is incorporated by reference as if set forth fully herein.

60.     As set forth above, during the relevant period Defendant Burtka, directly or indirectly, controlled both the City and the City Administrator.

61.     Defendant Burtka is liable as a control person for the City's violations of Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §

240.10b-5].

62.     Defendant Burtka is liable as a control person for the City Administrator's

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5].

63.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Defendant

Burtka is liable jointly and severally with and to the same extent as the City and the City

Administrator.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court enter a judgment:

A.      Permanently enjoining Defendant Burtka from violation, and from inducing

violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.

§ 240.10b-5] promulgated thereunder;

B.      An order pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)] imposing a civil penalty against Defendant Burtka;

C.      An order pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §

78u(d)(5)] permanently barring Defendant Burtka from participating in an offering of municipal

securities, as defined in Section 3(a)(29) of the Exchange Act [15 U.S.C. § 78c(a)(29)], including

engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing

or attempting to induce the purchase or sale of any municipal security, *provided,* however, that

such injunction shall not prevent Defendant Burtka from purchasing or selling municipal

securities for his own personal account;

       D.       Retaining jurisdiction of this action in accordance with the principles of equity

and the Federal Rules of Civil Procedure in order to implement and to carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion by the

Commission for additional relief within the jurisdiction of this Court; and

       E.       Granting such further relief as the Court may deem appropriate.


Date:  November 6, 2014                   Respectfully submitted,

                                               s/ Sally J. Hewitt
                                               John E. Birkenheier (Illinois Bar No. 6270993)
                                               Sally J. Hewitt (Illinois Bar No. 6193997)
                                               Counsel for Plaintiff U.S. Securities
                                             and Exchange Commission
                                               175 West Jackson Blvd., Suite 900
                                             Chicago, IL  60604
                                           (312) 353-7390